2020 IL App (1st) 172852-U

No.1-17-2852

Order filed June 23, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 14137 |
| | ) | |
| CLYDE HEARD, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD-SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The summary dismissal of defendant's *pro se* postconviction petition is affirmed over his contention that the petition presented an arguable claim of ineffective assistance of trial counsel.

¶ 2    Defendant Clyde Heard appeals from the circuit court's first-stage dismissal of his *pro se* petition for relief filed under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq*. (West 2016)). On appeal, he contends that this court should remand for further postconviction

proceedings because he raised an arguable claim that he was denied the effective assistance of counsel where he provided his trial counsel with a list of three alibi witnesses who were willing to testify on his behalf but counsel failed to investigate or call those witnesses. We affirm.

¶ 3     Following a 2014 jury trial, defendant Clyde Heard was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) for the fatal shooting of Ewonte Butler on July 29, 2011. He was sentenced to 65 years' imprisonment. We affirmed his conviction and sentence on direct appeal. *People v. Heard*, 2016 IL App (1st) 141672-U. We recount the facts adduced at trial only as necessary for the disposition of the current appeal.

¶ 4     At trial, Chicago police officer Michael Rivera testified that a little past 7:00 p.m. on July 29, 2011, he was working with his partner when they received an assignment regarding a person shot at Washington Boulevard and Lotus Avenue in Chicago. When Rivera arrived at that intersection, he saw Butler on the ground. Butler had suffered gunshot wounds and was transported to the hospital.

¶ 5     A police pod camera, which is a video camera located on the top of a pole, captured views of the intersection at Washington and Lotus. Rivera viewed the pod camera footage, which showed a group of people standing at the corner of Washington and Lotus. In the distance, he could see a person on a bicycle and a person on the ground. The person on the bicycle rode eastbound on Washington then turned northbound onto Long Street, where the pod camera was located. Rivera "believe[d]" the person on the bicycle was a heavyset black male.

¶ 6     Diveda Duplessis testified that, shortly after 7:00 p.m. on July 29, 2011, she was in the area of Washington and Lotus visiting her family. She was talking with her mother on the southwest corner of Washington and Lotus. At 7:12 p.m., she saw Butler, whom she knew from the neighborhood and by the nickname, "Too Fee," standing across the street from her. A man rode

his bicycle up to Butler and shot him from a few feet away. She heard several gunshots. Duplessis saw the shooter ride eastbound on Washington before she lost sight of him.

¶ 7    Duplessis identified defendant in court as the shooter. Defendant was wearing a white tee shirt and dark jeans when she saw him shoot Butler. He also had tattoos on his neck and shoulder length dreadlocks. She had seen defendant twice before in the neighborhood, but she did not know his name. Butler was friends with Duplessis' nephew.

¶ 8    On August 2, 2011, Duplessis viewed a physical lineup at the police station and identified defendant as the shooter. The individuals in the lineup all had their necks covered. When police interviewed her at her home and later recorded her interview at the police station, Duplessis told them she saw two people on bicycles. When Duplessis saw defendant raise his arm and heard shots fired, the second person on a bicycle was not near defendant or Butler.

¶ 9    Duplessis did not recall if she told police about the tattoos on defendant's neck. She told them that defendant's hair had "a twisted braided something." She did not recall what description she gave of the other bicyclist.

¶ 10    Theodis Washington testified that he was at the corner of Washington and Lotus with Butler, Montana Harris and Dantrell McIntyre. He had known Butler and Harris for eight years from school and McIntyre from the neighborhood. A man with braids and tattoos on his neck and chest rode up on a bicycle and fired his gun at Butler, who was standing several feet away from Washington. Butler fell to the ground and the shooter rode away on his bicycle. Washington identified defendant in court as the shooter. On August 1, 2011, Washington went to the police station and identified defendant as the shooter in a photo array in which the necks of the individuals in the photographs were covered. Washington had seen defendant in the neighborhood once or twice prior to the shooting.

¶ 11    Jessica Lofton testified that on July 29, 2011, she lived on the corner of Washington and Lotus. About 7:00 p.m., she was looking out over Washington from a second-story window and saw a group of boys from the neighborhood standing on the corner of Washington and Lotus. A man, who was wearing a white tee shirt and dark jeans, rode up on a bicycle and fired a gun at the group and then rode away. Lofton heard five gunshots and saw the victim fall to the ground. Nothing obstructed her view of the incident. Lofton called the police. Lofton identified defendant in a line up and in court as the shooter.

¶ 12    Lofton further testified that the first time she saw defendant on his bicycle he was heading westbound on Washington and turned onto Lotus headed northbound. She lost sight of defendant for a short period of time. As she was continuing to look through her window, she heard gunshots before she saw anything happen. She then saw defendant by the group of boys with his bicycle on the ground.

¶ 13    Montana Harris testified that he and Butler were outside listening to music and sharing the same headphones. While they were on the corner of Washington and Lotus, Harris heard gunfire. Harris saw a man on a bicycle shoot at Butler. The man fired the gun five times. He was wearing a white tee shirt and blue jeans and had tattoos on his neck and arm. Harris testified he had previously seen the man in the neighborhood but did not know his name. Harris identified defendant in court as the shooter.

¶ 14    Harris went to the police station on August 1, 2011, and identified defendant in a photo array as the shooter. The following day, he returned to the police station and identified defendant as the shooter in a lineup. Harris testified that he told police that defendant's hair had dreads or braids. He told the police that he believed the shooter lived on Long.

¶ 15    The parties stipulated that, if called, a medical examiner would testify that the cause of Butler's death was multiple gunshot wounds. Cassandara Richards, a forensic scientist with the Illinois State Police Crime Lab, testified that she examined a discharged cartridge case recovered from the scene and did not find any latent fingerprints suitable for comparison.

¶ 16    The defense presented two stipulations. First, the parties stipulated that, if called, Detectives Carney and Xanos would testify that, on August 1, 2011, they interviewed Duplessis at her home and that she stated she observed two black men riding their bicycles eastbound on Washington, and that, after the shooting, they rode eastbound on Washington. Duplessis did not describe the shooter as having tattoos on his neck. The parties further stipulated that, if called, Detective Tedeschi would testify that he interviewed Duplessis in August 2, 2011, along with an Assistant State's Attorney, and that, in describing the shooter, Duplessis did not describe the shooter as having tattoos on his neck.

¶ 17    At the close of evidence, the jury found defendant guilty of first-degree murder. Following a hearing, the court sentenced defendant to 65 years in prison, 40 years for first degree murder plus a 25-year firearm enhancement.

¶ 18    On direct appeal, defendant argued that the trial court denied him his right to present a defense and confront Washington and Harris with evidence of bias and motive to testify falsely. We affirmed his conviction and sentence. *People v. Heard*, 2016 IL App (1st) 141672-U.

¶ 19    On July 3, 2017, defendant filed a *pro se* postconviction petition under the Act, alleging, *inter alia*, that he was denied the effective assistance of trial counsel where he provided a list of witnesses to counsel, but counsel failed to investigate or call those witnesses. In his petition, defendant explained that his first appointed counsel withdrew, and new counsel was appointed to represent him. Defendant claimed that, prior to trial, he provided both of his counsels with a list

of three witnesses who were willing to testify on his behalf: Christopher Gregory, Jasmine Street, and Jeremy Fentry. Defendant claimed that these witnesses would have testified that he was "hanging out" with them on Lockwood Avenue and Huron Street between 7:00 p.m. and 12:30 a.m. on July 29, 2011. Defendant explained that Street and Fentry told Gregory to tell defendant that they would testify on his behalf. Gregory told, "James," who "gave [defendant the] message" and provided defendant with Gregory's phone number. Defendant relayed that his lawyer would call Gregory, but Gregory and Fentry never received a call from his lawyer.

¶ 20     Defendant did not attach his own affidavit and, although he repeatedly referenced his own affidavit as "Exhibit A" to his postconviction petition, no such exhibit is included in the record. Defendant did not provide an explanation in his petition for why his own affidavit was not attached to his petition. Defendant did not attach affidavits or statements made by Gregory, Street, or Fentry. He explained in his petition that, due to multiple transfers in the Illinois Department of Corrections, he had lost their contact information. Defendant attached several transcripts from his trial proceedings, in support of his various claims. One such transcript from pretrial proceedings on March 7, 2012, shows that defendant's first appointed counsel informed the trial court, "in speaking to [defendant] at Stateville, we did get a list of witnesses. We are still investigating that list of witnesses, so we are asking for a short date on this matter, Judge."

¶ 21     On August 28, 2017, the circuit court issued a written order dismissing defendant's postconviction petition as frivolous and patently without merit. In the order, the court noted that the decision of whether or not to call witnesses is generally a matter of trial strategy and that defendant failed to attach affidavits from the potential witnesses. The court found that defendant's assertion that the witnesses would have testified that they were with him from "around" or "about" 7:00 p.m. on July 29, 2011 would not have provided him with an alibi where the State's witnesses

had testified at trial that the shooting took place between 7:00 and 7:12 p.m. The court further found that it could not be said that there was a reasonable likelihood the outcome of the trial would have been different where the evidence against defendant was very strong and four eyewitnesses had identified him as the shooter at trial.

¶ 22    This court allowed defendant's late notice of appeal on December 4, 2017.

¶ 23    On appeal, defendant contends that his trial counsels were ineffective for failing to investigate and call Christopher Gregory, Jasmine Street, and Jeremy Fentry as alibi witnesses. He argues that the court erred in dismissing his postconviction petition as frivolous and patently without merit because he satisfied the low standard of a first stage proceeding. He further argues that he was not strictly required to attach affidavits from the potential witnesses where he explained his failure to do so, and that the trial court engaged in improper fact-finding in determining that the proposed testimony of the three potential witnesses would not have provided him with an alibi.

¶ 24    The Act provides a method by which a defendant can assert that his conviction was the result of a substantial denial of his constitutional rights. *People v. Tate*, 2012 IL 112214, ¶ 8. At the first stage of postconviction proceedings, the circuit court may dismiss a petition only if it is " 'frivolous or patently without merit.' " *People v. Cotto*, 2016 IL 119006, ¶ 26 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2010)). A petition is frivolous or patently without merit if it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). A petition lacks an arguable basis in law or fact where it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "A legal theory is 'indisputably meritless' if it is 'completely contradicted by the record,' and a factual allegation is 'fanciful' if it is 'fantastic or delusional.' " *People v. Papaleo*, 2016 IL App (1st) 150947, ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 16-17).

¶ 25   Because most petitions are drafted at the first stage by *pro se* defendants, the threshold for a petition to survive the first stage of postconviction review is low. *People v. Allen*, 2015 IL 113135, ¶ 24. This low threshold, however, "does not excuse the *pro se* [defendant] from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are 'capable of objective or independent corroboration.' " *Id.* (quoting *People v. Collins*, 202 Ill. 2d 59, 67 (2002)). A defendant's failure to attach the affidavits or documentation required by section 122-2, or otherwise explain their absence, is "fatal" to his postconviction petition and alone justifies summary dismissal of that petition. *People v. Delton*, 227 Ill. 2d 247, 255 (2008); *Collins*, 202 Ill. 2d at 66; see *Allen*, 2015 IL 113135, ¶ 26 (a postconviction petition that fails to comply with section 122-2 is "substantially incomplete"). We review the dismissal of a first-stage postconviction petition *de novo*. *Allen*, 2015 IL 113135, ¶ 19.

¶ 26   In this court, defendant contends that the court erred in summarily dismissing his petition because he presented an arguable claim that his trial counsels were ineffective for failing to investigate and call Gregory, Street, and Fentry as alibi witnesses.

¶ 27   A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., Amends. VI, XIV; Ill. Const. 1970, Art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *People v. Domagala*, 2013 IL 113688, ¶ 36. At the first stage of postconviction proceedings, the circuit court may not summarily dismiss a petition alleging ineffective assistance of counsel where: (1) counsel's performance arguably fell below an objective standard of reasonableness, (2) which arguably prejudiced petitioner. *People v. Scott*, 2011 IL App (1st) 100122, ¶ 29; see *Tate*, 2012 IL 112214, ¶¶ 19-20. Deficient performance is performance that is

objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Petrenko,* 237 Ill. 2d 490, 496-97 (2010); *Strickland,* 466 U.S. at 690, 694.

¶ 28    After reviewing the record, we find that the court did not err in summarily dismissing defendant's postconviction petition. In this case, defendant has failed to present any support for his claim that trial counsel failed to investigate or present the testimony of his potential witnesses. Section 122-2 of the Act provides a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). "The purpose of the 'affidavits, records, or other evidence' requirement is to establish that a petition's allegations are capable of objective or independent corroboration." *Hodges*, 234 Ill. 2d at 10 (citing *Delton*, 227 Ill. 2d at 254). Thus, the supporting material must (1) show "the petition's allegations are capable of corroboration" and (2) identify "the sources, character, and availability of evidence alleged to support the petition's allegations." *Allen*, 2015 IL 113135, ¶ 34.

¶ 29    Here, although defendant repeatedly referenced his own affidavit in his postconviction petition, it is not attached to his petition and has not been included in the record on appeal. Defendant has not provided any explanation for his failure to include his own affidavit with his petition. Defendant is clearly a source of information that he was with his purported alibi witnesses at the time of the shooting. See, *e.g., People v. Harris*, 206 Ill. 2d 293, 301 (2002) (stating "defendant is the source of this [alibi] information and was armed with this information at the time of trial.").

¶ 30    Instead of providing his own affidavit or affidavits from his potential alibi witnesses, defendant has merely provided his own summary in his petition of what he claims the potential alibi witnesses' testimony would have been. Defendant's summary, as explained in his petition, is based on what Street and Fentry told Gregory, who told "James," who told defendant prior to trial. This does not demonstrate that the allegation in the petition is capable of objective or independent corroboration, nor does it establish the availability of supporting evidence. See *People v. Harris*, 2019 Il App (4th) 170261, ¶ 14 (defendant's personal evidentiary affidavit summarizing what he believed the testimony of potential witnesses would have been did not demonstrate defendant's postconviction claim was capable of objective or independent corroboration, or identify the availability of evidence to support the claim); *People v. Brown*, 2014 IL App (1st) 122549, ¶ 58 (three unnotarized affidavits that defendant authored on her own behalf failed to provide independent corroboration and were insufficient to support a claim under the act); see also *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 88 (considering the "problematic" nature of hearsay affidavits used to support postconviction claim of actual innocence). Although we must accept factual allegations at the first-stage of postconviction proceedings as true unless positively rebutted by the record, defendant must still set forth facts which can be corroborated and are objective in nature or explain why those facts are absent. See *Hodges*, 234 Ill. 2d at 10.

¶ 31    In most cases where, as here, a defendant raises a claim of ineffective assistance based on counsels' failure to investigate and call a witness, the defendant must include affidavits from the potential witnesses because, without an affidavit from the proposed witness," there can be no way to assess whether the proposed witness could have provided evidence that would have been helpful to the defense" *People v. Dupree*, 2018 IL 122307, ¶ 34. However, an affidavit from the proposed

witness may not be required under section 122-2 of the Act, where the claim is supported by the record or other evidence. *Id.*

¶ 32   In this case, contrary to defendant's claim that his trial counsels failed to interview potential witnesses, the record shows that defendant provided counsel with a list of his potential witnesses and counsel was "investigating that list of witnesses" prior to trial.  Thus, in contrast to the cases relied on by defendant, the record in this case does not support defendant's claim that trial counsels failed to investigate his potential witnesses, and defendant has not provided any other evidence or documentation to support his claim. *Cf. People v. Hanks*, 335 Ill. App. 3d 894, 899 (1st Dist. 2002) (finding affidavit from potential witness not required where the record contained factual support for defendant's claim); *People v. Morris*, 335 Ill. App. 3d 70, 84-85 (1st Dist. 2002) (same); see *People v. Hernandez*, 351 Ill. App. 3d 28, 35 (1st Dist. 2004) (the defendant, who provided his own affidavit, was not required to submit additional evidence to support his claim of ineffective assistance where the court could "easily infer" that the only other evidence he could have furnished would have been an affidavit from his attorney).

¶ 33   The Act provides that a petitioner must attach supporting documentation or explain why he is unable to do so. See 725 ILCS 5/122-2 (West 2016). Although defendant repeatedly referenced his own affidavit in his postconviction petition, it is not included in the record, and defendant does not provide any explanation for his failure to include his own affidavit with his petition. Defendant explained in his petition that he was unable to obtain affidavits from Gregory, Street, or Fentry because he lost their contact information due to multiple transfers while incarcerated. On its own, defendant's incarceration does not explain his failure to supply supporting documentation required under section 122-2 of the Act because relief under the Act is available only to people who are "imprisoned in the penitentiary." 725 ILCS 5/122-1(a) (West

2016); see *Harris*, 2019 IL App (4th) 170261, ¶ 19 ("Because the Act contemplates defendants seeking postconviction relief are likely to be imprisoned, we hold imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition."); but see *People v. Washington*, 38 Ill. 2d 446, 448-49 (1967) (noting petition "stated why affidavits were not attached" where it explained the defendant was not able to obtain affidavits because he was "incarcerated and indigent" but finding the State forfeited argument that defendant failed to support the allegations in his petition). Here, defendant does not describe any efforts that he made to obtain any affidavits or any attempts he made to acquire them, or other supporting evidence.

¶ 34     Accordingly, the trial court did not err in summarily dismissing defendant's postconviction petition because defendant failed to provide any affidavits or other evidence to support his allegation that his counsel was ineffective for failing to investigate or call potential alibi witnesses. Based on our finding that defendant failed to properly support his claim, we need not consider whether he stated an arguable claim that he was denied the effective assistance of counsel or his contention that the circuit court engaged in improper fact-finding when summarily dismissing his petition. See *Brown*, 2014 IL App (1st) 122549, ¶ 46 ("If a postconviction petition is unsupported as required by section 122–2, then we need not consider whether the petition sets forth the gist of a constitutional claim") (citing *Delton*, 227 Ill. 2d at 255).

¶ 35     For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36     Affirmed.