2024 IL App (1st) 230181-U

No. 1-23-0181

Order filed April 12, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 10305 |
| | ) | |
| EDWARD LOGAN, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court erred in summarily dismissing defendant's *pro se* postconviction petition, which stated an arguable claim that trial counsel was ineffective.

¶ 2     Edward Logan appeals from the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2022)). On appeal, Logan contends he raised an arguably meritorious claim that trial counsel was ineffective for failing to investigate a witness who would have testified that the victim fabricated the allegations.

¶ 3    We reverse the first-stage dismissal and remand for second-stage proceedings. Logan alleged sufficient facts to establish the gist of a constitutional claim that trial counsel was ineffective. Taken as true, the allegations about the victim's fabrications arguably could have impacted her credibility and affected the outcome.

¶ 4                              Background

¶ 5    At the bench trial, D.C. testified that in November 2012, she was 13 years old and lived with her mother and Logan, who dated her mother. D.C.'s mother told her she could not see certain friends after school or have a phone. On November 19, at about 7 p.m., Logan approached D.C., asleep in her bed, and said her mother told him to "watch" her because she was "being bad." Logan drove D.C. to a McDonald's restaurant and a liquor store. When they returned, Logan parked in the garage close to the wall so D.C. could not open her door and gave her his phone to call a friend. Logan asked if D.C. wanted to see a friend. When she said yes, he said she had "to do something" for him. D.C. understood what he meant because "the vibe [was] weird."

¶ 6    D.C. described details of a sexual assault and said she asked Logan to stop. After they were "done," D.C.'s mother called and spoke to Logan. D.C. testified that Logan told her, "what happened in this truck stays in the truck," and "[i]f you tell, we both will get in trouble." Two days later, D.C. told her sister, who told her mother. D.C. then told her mother, who took her to the hospital for medical attention.

¶ 7    The State introduced stipulations that three stains from two pairs of D.C.'s underwear were submitted for DNA analysis.

¶ 8    The first sample, identified as 1A1, contained several DNA samples suitable for comparison. Logan could not be excluded, but for one sample, the DNA in the sperm fractions

could be found in 1 out of every 20 unrelated males; for the second sample, the DNA could be found in 1 out of every 72 unrelated males; and for the third sample, the DNA could be found in 1 out of every 2 unrelated males.

¶ 9    In sample 1B1, the analyst found a non-sperm mixture of four male DNA samples from which Logan could not be excluded. The DNA would be found in 52% of unrelated African-American males, 78% of unrelated white males, and 80% of unrelated Hispanic males. The analyst found a mixture of DNA from three males, and Logan was affirmatively excluded.

¶ 10    Finally, the non-sperm fraction of sample 1B2 included a mixture of DNA from six males from which Logan could not be excluded. This DNA would be found in 98% of unrelated African-American males, 99% of unrelated white males, and 99% of unrelated Hispanic males. The sperm fraction of 1B2 continued a mixture of DNA of two males from which Logan could be affirmatively excluded. The mixed fraction of 1B2 included DNA from five males from which Logan could not be excluded but which could be found in 91% of unrelated African-American males, 85% of unrelated white males, and 91% of Hispanic males.

¶ 11    After the State rested, Logan informed the court that he wished to proceed *pro se* because he disagreed with defense counsel's strategy and wanted to recall D.C. to continue questioning her. The court informed Logan that the trial would not be restarted, and Logan responded that he understood. The court admonished Logan and allowed him to proceed *pro se*.

¶ 12    Logan recalled D.C. and questioned her extensively regarding the events in the State's case-in-chief. Logan also called Latasha S., D.C.'s mother, who testified about D.C.'s outcry, contacting the police, and going to the emergency room. She said D.C. felt as if Logan "always pick[ed] on her," and Logan and D.C. "butt[ed] heads on a regular basis."

¶ 13    Logan introduced the parties' stipulations that D.C. informed a Department of Children and Family Services reporter that Logan told her to remove her clothes and "that it happened more than one time." Further, Chicago police detective Darren Crowder would testify that, when he interviewed D.C. at the hospital, she said she called friends with Logan's phone at the beginning of the incident but "became tired" of speaking with them. She stated Logan adjusted the seat and steering wheel before removing his shoes and clothes, asked D.C. to remove her clothes, the oral sex happened after the vaginal intercourse, Logan ejaculated into her mouth, and D.C. went to a friend's house after the incident.

¶ 14    The parties further stipulated that D.C. testified before the grand jury that Logan touched her leg, asked her to remove her clothing, and spat out Logan's semen after getting out of the truck. D.C. never informed the grand jury about stopping at a liquor store. Lastly, an assistant state's attorney would testify that D.C. related to him the same account she had told the detective about, except that Logan, not D.C., removed her clothes.

¶ 15    The court found Logan guilty of three counts of criminal sexual assault of a family member under 18 years of age and one count of aggravated criminal sexual abuse. In ruling, the court commented that the determinative factor was that D.C.'s testimony was credible and believable. But, the court noted the DNA evidence was inconclusive but corroborative as Logan was not excluded from the semen on D.C.'s underwear. The court reappointed defense counsel for sentencing. After a hearing, the court merged the count on aggravated criminal sexual abuse into one of the counts for criminal sexual assault and imposed 17 years' imprisonment.

¶ 16    On direct appeal, Logan argued that (i) the State failed to prove beyond a reasonable doubt that he was D.C.'s "family member," (ii) the trial court erred in preventing him from cross-

examining D.C. on prior sexual encounters related to the other male DNA discovered on her underwear, (iii) trial counsel was ineffective for failing to protect Logan's statutory right to a speedy trial, and (iv) Logan was deprived of his right to a speedy trial. We affirmed. *Logan*, 2022 IL App (1st) 190021-U.

¶ 17    Logan filed the *pro se* postconviction petition at issue, arguing that ineffective assistance for not investigating Donnie S., D.C.'s grandfather, who informed Logan that D.C. fabricated her allegations "to get [Logan] away from the residence." According to Logan, during recorded phone calls to the Cook County jail, Donnie S. told Logan that D.C. and her younger sister told Donnie S. "the story was fabricated." Logan told trial counsel about this "witness," but counsel never attempted to verify the claim or introduce the recorded phone calls. Logan also argued that appellate counsel should have raised trial counsel's ineffectiveness in his direct appeal.

¶ 18    Logan attached his affidavit averring that Donnie S. told him that D.C. and her friend "Esperanza" "consorted to fabricate the allegations of sexual assault" to remove Logan from the residence so D.C. could "come and go as she pleased" with little adult supervision. According to Logan, he mailed several letters to Donnie S. explaining the importance of an affidavit. But, as D.C.'s family had "cut off all communications" with him and anyone who aided him, Logan could not supply an affidavit directly from Donnie S. Logan included addresses for Donnie S. and Esperanza. He stated that, four months before trial, he informed trial counsel verbally and in writing of Donnie S., "what [Donnie S.] would have testified to," and contact information, but counsel never investigated the witness.

¶ 19    Logan also attached a March 25, 2018, letter to trial counsel in which Logan suggested counsel subpoena telephone "conversations" Logan had with Donnie S. in which Donnie S. told him that D.C.'s "motive" was to "get [Logan] away" from the residence.

¶ 20    The court found Logan's petition frivolous and patently without merit. In a written order, it stated that Logan was unable to establish because he represented himself during his case-in-chief and could have called Donnie S.

¶ 21                                    Analysis

¶ 22    Logan contends that he presented an arguable claim that trial counsel was ineffective for failing to investigate Donnie S., who would have testified that D.C. fabricated the allegations.

¶ 23    The Act provides a three-stage mechanism by which defendants may collaterally challenge their convictions for violations of constitutional rights. 725 ILCS 5/122-1 *et seq*. (West 2022); *People v. LaPointe*, 227 Ill. 2d 39, 43 (2007). The circuit court dismissed Logan's petition at the first stage of proceedings. At the first stage, the circuit court must independently review the petition, taking the allegations as true, and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022); *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). A petition is frivolous or patently without merit if it has no arguable basis in law or fact and relies on a meritless legal theory or fanciful factual allegations. *People v. Hodges*, 234 Ill. 2d 1, 11-13, 16 (2009). A meritless legal theory means that the record completely contradicts it. *People v. White*, 2014 IL App (1st) 130007, ¶ 18. Fanciful factual allegations "include those which are fantastic or delusional." *Hodges*, 234 Ill. 2d at 17.

¶ 24    The petition must present a limited amount of detail, not the entire claim. *Edwards*, 197 Ill. 2d at 244. Although a *pro se* petitioner has to set forth the gist of a constitutional claim, this low

threshold does not excuse the petitioner from providing factual details regarding the alleged constitutional violation. *Hodges*, 234 Ill. 2d at 10. " '[W]hile a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent. " *Id.* at 9 (quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008)). Unsupported allegations in a postconviction petition are frivolous and patently without merit. *People v. Collins*, 202 Ill. 2d 59, 68-69 (2002). Our review is *de novo. Hodges*, 234 Ill. 2d at 9.

¶ 25    To state a claim of ineffective assistance of counsel in first stage postconviction proceedings, a defendant must demonstrate it is arguable that (i) counsel's performance " 'fell below an objective standard of reasonableness' " and (ii) counsel's deficient performance prejudiced the defendant. *Id.* at 17 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). More specifically, a defendant must show it is arguable that "counsel's performance was objectively unreasonable under prevailing professional norms and a 'reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694).

¶ 26    "Trial counsel has a duty to conduct both factual and legal investigations." *People v. Montgomery*, 327 Ill. App. 3d 180, 185 (2001). Whether a trial counsel's failure to investigate amounts to ineffectiveness "is determined by the value of the evidence which was not presented at trial and the closeness of the evidence that was presented." *Id*. "Where circumstances known to counsel at the time do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. Nevertheless, failing to investigate known witnesses "can indicate

incompetence when their testimony could be exonerating." *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 42. Trial strategy is an "inappropriate" consideration for the first stage of proceedings. *People v. Tate*, 2012 IL 112214, ¶ 22.

¶ 27                                        *Forfeiture*

¶ 28    As an initial matter, claims that could have been raised on direct appeal but were not are generally considered forfeited and thus barred from consideration in a postconviction proceeding. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 41. Logan's claim for ineffective assistance of counsel, however, depends on matters outside the trial record, so it could not have been raised on direct appeal. See *People v. Cherry*, 2016 IL 118728, ¶ 33; *Brown*, 2014 IL App (1st) 122549, ¶ 41.

¶ 29    Further, normally, "a person proceeding *pro se* may not later complain that he [or she] received ineffective assistance of counsel." *People v. Simpson*, 204 Ill. 2d 536, 565 (2001). But, as Logan represented himself for part of the relevant proceedings, his appointed counsel still had a duty to provide constitutionally effective representation before and after Logan proceeded *pro se*. See *People v. Davis*, 2023 IL App (4th) 220278-U, ¶ 48.

¶ 30                        *Ineffective Assistance of Counsel Claim*

¶ 31    The allegations in Logan's petition, taken as true, establish an arguable claim of ineffective assistance for failing to investigate Donnie S. as a witness before trial. At trial, the court relied primarily on D.C.'s testimony and her credibility in finding Logan guilty of criminal sexual assault because the DNA evidence was not conclusive. Logan averred Donnie S. told him that D.C. fabricated the allegations of sexual assault to remove Logan from the house. Taking Logan's allegations regarding Donnie S.'s potential testimony as true, the testimony could have

undermined D.C.'s credibility, which was the determinative factor in finding Logan guilty. See *Simmons*, 2020 IL App (1st) 170650, ¶ 42 ("failure to interview known witnesses can indicate incompetence when their testimony could be exonerating").

¶ 32     Trial counsel has a duty to conduct reasonable investigations into possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. Logan attested that he informed counsel about Donnie S.'s potential testimony four months before trial. Logan attached a letter he sent his trial counsel advising counsel that Donnie S. informed Logan that D.C.'s "motive" was to remove Logan from the house. The record does not refute Logan's assertion that counsel did not investigate Donnie S. as a potential witness. Logan's trial counsel never disclosed Donnie S. as a potential witness (see Ill. S. Ct. R. 413(d)(i) (eff. July 1, 1982)), and the record does not contain evidence establishing that he interviewed Donnie S. Thus, trial counsel's alleged failure to investigate Donnie S., a known witness who could call D.C.'s credibility into doubt, was arguably deficient. See *Domagala*, 2013 IL 113688, ¶ 38.

¶ 33     Further, counsel's deficient performance arguably prejudiced Logan. Had his counsel investigated, Donnie S. might have testified about D.C. having fabricated the allegations against him.

¶ 34     The State contends that Logan could not claim ineffective assistance of counsel because he proceeded *pro se* and "ultimately exercised total control over the defense strategy and witness selection" and could have called Donnie S. if he so chose. Yet, as noted, the record contains no evidence that trial counsel ever investigated Donnie S., which should have happened before trial. Thus, trial counsel's failure to investigate a potentially exculpatory witness is arguably deficient.

See *Simmons*, 2020 IL App (1st) 170650, ¶ 42. Further, as Logan took over his defense after the State rested, he could not have called Donnie S. as counsel had not disclosed him as a witness.

¶ 35    The State further contends that Logan failed to demonstrate arguable prejudice because Donnie S.'s proposed testimony consisted "entirely of hearsay." The State concedes that the Illinois Rules of Evidence do not apply to postconviction hearings (see Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019)) but maintains that Logan did not establish arguably the outcome would have been different had Donnie S. testified because the hearsay nature of the testimony is relevant to determining the probability of a different result. We disagree.

¶ 36    We note that, at the first stage, a *pro se* petitioner must provide a sufficient factual basis to show the allegations in the petition are capable of objective or independent corroboration. *People v. Allen*, 2015 IL 113135, ¶ 24; 725 ILCS 5/122-2 (West 2022). Where a petition lacks the requisite supporting evidence, the petitioner must explain why he or she did not attach that evidence. 725 ILCS 5/122-2 (West 2022); *Allen*, 2015 IL 113135, ¶ 26.

¶ 37    Logan's affidavit summarized Donnie S.'s potential testimony regarding Donnie S.'s knowledge of D.C.'s allegedly false allegations and motive and that he mailed Donnie S. multiple times regarding the importance of providing an affidavit. Logan stated that D.C.'s family "cut off all communications" with him and anyone who aided him, he was unable to provide an affidavit directly from Donnie S. We find his explanation sufficient. See 725 ILCS 5/122-2 (West 2022).

¶ 38    The State contends that the substance of Donnie S.'s testimony would consist entirely of hearsay. As noted, to survive the first stage, a postconviction petition has to establish facts that can be corroborated and are objective (see *Hodges*, 234 Ill. 2d at 10), and the Illinois Rules of Evidence, including the hearsay rules, do not apply to postconviction proceedings (see Ill. R. Evid.

1101(b)(3) (eff. Sept. 17, 2019)). See *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 114 (under Rule 1101(b)(3) of Illinois Rules of Evidence, rules of evidence "(including the rules against hearsay)" do not apply to postconviction hearings). Further, we take the allegations in Logan's petition and accompanying affidavit as true and liberally construe them in the first stage. See *Edwards*, 197 Ill. 2d at 244-45. Thus, that Donnie S.'s testimony would consist of hearsay is not a valid basis for affirming the summary dismissal. See *Velasco*, 2018 IL App (1st) 161683, ¶ 117-18 (hearsay affidavits of two witnesses were admissible and to be taken as true when determining whether to advance postconviction petition to third stage).

¶ 39    Lastly, the State contends that Logan failed to establish that it was arguable that Donnie S.'s testimony would have changed the outcome. We disagree. As noted, the court relied primarily on D.C.'s testimony to find Logan guilty. The court determined D.C.'s testimony was credible. Therefore, that D.C. fabricated the allegations to remove Logan from her house, taken as true, could arguably impact D.C.'s credibility and affect the outcome. Trial counsel's failure to investigate this potentially exonerating witness was arguably ineffective. See *Simmons*, 2020 IL App (1st) 170650, ¶ 42.

¶ 40    Reversed and remanded.